UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

REGINALD MIDDLETON, *et al.*,

                  Plaintiffs,

      -against-

T-MOBILE US, INC.,

                Defendant.
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

**MEMORANDUM & ORDER**
**20-CV-3276 (NGG) (JRC)**

NICHOLAS G. GARAUFIS, United States District Judge.

Reginald Middleton and his company, Veritaseum, LLC, bring this suit against T-Mobile US, Inc., alleging failures by T-Mobile to protect Middleton's accounts. (Compl. (Dkt. 1).) Middleton is an investor who claims he was the victim of a "SIM card swapping" scheme by hackers who duped T-Mobile into improperly authorizing access to his phone, facilitating the theft of $8.7 million in cryptocurrency. Middleton alleges violations of the Federal Communications Act; negligence; violations of the New York Consumer Protection Act; negligent hiring, retention, and supervision; negligent infliction of emotional distress; and gross negligence.

T-Mobile moves to compel arbitration of these claims. For the reasons explained below, the company's motion is GRANTED.

## I.   BACKGROUND[1]

To protect against unauthorized access to so much of our personal information, many technology companies use multi-factor authentication in addition to login and password screens. Users

---

[1] The following facts are drawn from the pleadings, the parties' affidavits, and all other admissible evidence in the record, including that which was produced after the court ordered a period of limited discovery. (*See* September 23, 2021 Order.) The facts described are undisputed unless otherwise noted.

first enter their credentials, and then a website or mobile app sends a message to their phone asking to approve the login. That way, a stolen password alone won't let an imposter in. The most secure way to do this (for now) is with an authentication app, like Duo or Google Authenticator. But if the website uses a text message rather than a push notification to seek approval, fraudsters have a ready work-around. They simply call up the cell phone company and try to convince it to switch the assigned phone number from the victim's SIM card to one of their own. Then the two-step notification texts will get sent to the hackers and, after also providing the victim's password – separately hacked, or maybe purchased on the Dark Web – they're in.

In this case, the account in question was especially attractive to thieves because it was that of a "well-known holder of cryptocurrency," Plaintiff Reginald Middleton. (Compl. ¶ 6.) Hackers called T-Mobile four times asking customer service to "swap" Middleton's SIM card, and on the fourth attempt the company finally acquiesced. (*Id.*) T-Mobile allegedly did so again the next month, the month after that, and twice the month after that, even though Middleton had repeatedly alerted the company to the attacks and it had assured him that it "would take steps to avoid future SIM swap occurrences." (*Id.* ¶ 9.) More attacks continued to succeed over the following years.[2] (*Id.* ¶ 11.)

Middleton's relationship with T-Mobile began on October 17, 2014, when he was added as an authorized user on a third-party's account. (Decl. of Reginald Middleton ("Middleton Decl. 1") (Dkt. 21-1) ¶ 2.) The terms and conditions for T-Mobile's services at all relevant times required mandatory arbitration of

---

[2] The events in this case took place between 2017 and 2019. Last summer, T-Mobile lost the personal information of 40 million people in an attack the Wall Street Journal quoted an expert as being "the biggest gift to SIM-swappers . . . in years." Drew FitzGerald and Robert McMillan, *Huge Breach At T-Mobile Affects Over 40 Million*, Wall St. J., Aug. 18, 2021.

disputes, subject to an opt-out procedure. At that time when Middleton's phone line was activated, he alleges he was never given any notice that he would be bound by arbitration, nor any opportunity to opt-out. (*Id.* ¶¶ 3-4.) On the same date, Middleton apparently bought a Samsung Galaxy Note device, though the parties dispute the details and significance of that purchase. (Suppl. Decl. of Christopher Muzio ("Muzio Decl. 2") (Dkt. 31-1) ¶¶ 3-4; Decl. of Reginald Middleton ("Middleton Decl. 2") (Dkt. 30-1) ¶¶ 21-23.) Some months later, Middleton became a responsible party for billing on the account, and some years after that, the third-party payer left the account. (Decl. of Christopher Muzio ("Muzio Decl. 1") (Dkt. 20-2) ¶¶ 3-4.) Later, in April 2015, Middleton again bought two Samsung Galaxy S6 Edge devices from T-Mobile stores on Flatbush Avenue and signed receipts for them. (Mot. to Compel, Ex. A (Dkt. 20-3) at ECF p. 2-3; Middleton Decl. 2, Ex. T (Dkt. 31-1) at ECF p. 39-41.)

Both of the April receipts were electronically signed and specified that "[a]ctivation or use of T-Mobile service is your agreement to T-Mobile's Terms and Conditions and any terms specific to your rate plan," and that "T-Mobile requires ARBITRATION of Disputes UNLESS, for new customers, YOU OPT OUT WITHIN 30 DAYS OF ACTIVATION, or for existing customers, you previously opted out pursuant to T-Mobile's Terms and Conditions." (Mot. to Compel, Ex. A at ECF p. 2-3; Middleton Decl. 2, Ex. T at ECF p. 39-41.) Middleton's service had already been activated the previous October; but in any case at no point did Middleton attempt to opt-out. (*See* Muzio Decl. 1 ¶ 23.) Though the record does not make clear whether the receipts were provided to Middleton in printed form, T-Mobile contends that the above provisions, at least as a matter of ordinary practice, would have been displayed to Middleton either on the point-of-purchase device or on a separate tablet device in-store. (Muzio Decl. 2 ¶¶ 10-11.) Middleton alleges, however, that he was not shown the *full* terms and conditions to his service; that he could not conduct a "complete

review and inspection" of the digital receipt because of the screen's small size, resolution, and inadequate backlighting; that the displayed receipt did not permit hyperlinked review of the full terms; that the display did not affirmatively seek his consent to arbitration by requiring he press a button or check a box; that the full terms were not separately provided in another form; and that his consent was not otherwise confirmed by T-Mobile personnel. (Middleton Decl. 2 ¶¶ 14, 15, 17, 19, 24, 29, 30.)

T-Mobile frequently updated its consumer terms and conditions over the following years. (Mot. to Compel, Ex. B (Dkt. 20-4), Ex. C (Dkt. 20-5), Ex. D (Dkt. 20-6), Ex. E (Dkt. 20-7), Ex. G (Dkt. 20-9), Ex. P (Dkt. 20-18).) Over about the same period, Middleton periodically bought new equipment from T-Mobile, and the company referenced and summarized whatever was the latest version of its terms on receipts for those purchases, which Middleton also electronically signed. (Mot. to Compel, Ex. F (Dkt. 20-8), Ex. H (Dkt. 20-10), Ex. J (Dkt. 20-12), Ex. K (Dkt. 20-13), Ex. L (Dkt. 20-14), Ex. N (Dkt. 20-16), Ex. O (Dkt. 20-17), Ex. Q (Dkt. 20-19); Muzio Decl. 1 ¶¶ 5-22.) Some of the later agreements – including two executed during the period of fraud that is the basis of Middleton's complaint – were completed on a Docusign platform, on which T-Mobile claims a customer would have been able to elect to view the entire terms and conditions. (Muzio Decl. 2 ¶ 12.)

In this motion, T-Mobile argues that Middleton and his company must arbitrate their claims because both parties agreed to do so; that Middleton's challenges to the enforceability of the putative contract must also be arbitrated; and that the court should stay the action in this court pending arbitration proceedings.

Middleton claims, in summary, that the parties chose New York law, which makes the arbitration agreement substantively invalid; that other provisions of the contract should be held

unenforceable; and that no binding arbitration agreement was ever formed under New York contract law.

## II.   MOTION TO COMPEL ARBITRATION

### A.   Legal Standard

The Federal Arbitration Act establishes a "liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).[3] The statute provides that agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The policy "is founded upon a desire to preserve parties' ability to agree to arbitrate, rather than litigate, their disputes." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019).

A court may only compel arbitration, however, when an arbitration agreement actually exists in the first place. A motion to compel requires the court to determine "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). These are questions for judicial determination – not questions for the arbitrator – unless the parties "clearly and unmistakably" agreed to arbitrate the threshold "question of arbitrability." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). The question of contract formation in the first instance is governed by the application of state contract law, *see Meyer*, 868 F.3d at 73-74, and is a legal determination for the court, *see Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co.*, 189 F.3d 289, 295 (2d Cir. 1999).

---

[3] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted and all alterations are adopted.

In this posture, the court applies a "standard similar to the one applicable to a motion for summary judgment." *Starke*, 913 F.3d at 281 n.1. As to facts, the court must "draw[] all reasonable inferences in favor of the non-moving party," *id.*, and consider "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017). "If a factual issue exists regarding the formation of the arbitration agreement [then] . . . a trial is necessary," *id.*, but the court must resolve "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration," *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d at 128.

In summary, then, the court finds facts where they are undisputed in the record or where a reasonable jury could not find them otherwise; and it then determines whether, on the basis of those facts, the parties may be legally found to have contractually agreed to arbitrate.

## B.  Discussion

Arbitrability in this case turns on two questions: first, whether, under New York law, Middleton was sufficiently on notice of T-Mobile's contract terms; and, second, whether he assented to them.[4] Such notice may be actual or implied:

> Where an offeree does not have actual notice of certain contract terms, he is nevertheless bound by such terms if he is on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent.

*Starke*, 913 F.3d at 289 (summarizing New York contract law). For reasons the court will describe, the more difficult question is whether Middleton was on reasonable notice that *there were*

---

[4] The parties do not dispute that New York law applies.

terms in the documents he signed. To answer that, "New York courts look to whether the term was obvious and whether it was called to the offeree's attention." *Id.* The second is more straightforward, because except for one agreement Middleton disputes, there is no doubt that Middleton signed the alleged purchase receipts, and that a reasonable person would understand his doing so as assent.

        1.   Reasonable Notice

This dispute sits somewhere in the middle of a spectrum of cases that nonetheless all apply the same law. At one end are conventional consumer product purchases, usually in-person from stores; at the other end are the same transactions, but conducted online. Courts generally distinguish among them by categorizing the agreements as different kinds of "wraps." *See, e.g., Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 22 n.4 (2d Cir. 2002) (describing "shrinkwrap" and "clickwrap" agreements); *see also Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 394-401 (E.D.N.Y. 2015) (identifying a number of other varieties). This case involves agreements that were made in T-Mobile stores, but nonetheless involved varying kinds of digital displays inside those stores.

It is undisputed that T-Mobile never presented Middleton with the kind of agreement that requires a specific action, like clicking a checkbox, to make obvious a particular term and require an affirmative act indicating assent to it. (Middleton Decl. 2 ¶¶ 17, 19; Muzio Decl. 2 ¶ 11.) Rather, Middleton was presented terms in different forms at different times. If he ever received a printed receipt – for which there is no evidence in the record – the contract would look most like a shrinkwrap agreement. (Middleton Decl. 2 ¶ 29; Muzio Decl. 2 ¶ 11.) If he was shown terms on a screen, the contract would look more like a browserwrap agreement. (Middleton Decl. 2 ¶ 13; Muzio Decl. 2 ¶¶ 10-12.)

The first kind, shrinkwrap agreements, are upheld so long as the customer has "notice of the existence of standard adhesion terms, even if they are not read or understood," so long as the customer is provided notice of the additional terms, even if the terms themselves can only be found elsewhere and after the purchase is made. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 232 (2d Cir. 2016) (applying Washington law); *see also Starke*, 913 F.3d at 289 (applying the same principle under New York law). The second kind, browserwrap agreements, generally feature a hyperlink on a website to additional terms that are accessible only by clicking through the link, even though doing so is not required and no button or checkbox must be clicked to signify assent. *See Nicosia*, 834 F.3d at 233. Such agreements are upheld so long as the website user has actual or constructive notice of the conditions. *See Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 836 (S.D.N.Y. 2012) (collecting cases). Regardless of the exact categorization, however, in either case what is critical is that "the existence of [the] terms [be] reasonably conspicuous." *See Nicosia*, 834 F.3d at 233.

Had Middleton simply thought he was signing a receipt for equipment purchases – and had no idea that *any* terms and conditions were displayed on the digital device he signed – the court might have concluded that there remained a question of fact suitable for resolution by a jury. Because T-Mobile apparently appends its service terms onto the receipts for all product purchases, where a customer might not expect them, and does not require customers to affirmatively confirm agreement to individual terms, it is easy to imagine how a customer might be left entirely unaware they had consented to a contract.

But this is not that case, because Middleton has never claimed that he was unaware that his transactions with T-Mobile carried terms and conditions. He has not alleged that he never received

a printed receipt, or never saw a digital display, of a notice indicating the existence of terms. And he has failed to allege those facts even though the court specifically directed the parties to engage in limited discovery to establish facts regarding

> (1) the terms and conditions provided to Plaintiff, if any, at the time Plaintiff's service was activated; (2) the terms and conditions provided to Plaintiff, if any, at the time of Plaintiff's in-store purchases; (3) the format in which the terms and conditions were provided to Plaintiff, if any terms and conditions were provided; and (4) the format in which receipts referencing terms and conditions were provided to Plaintiff, if any.

(September 23, 2021 Order.) Instead, Middleton says only that he was unaware of the arbitration agreement *within* T-Mobile's terms, and that he was not provided the terms in full. (Middleton Decl. 1 ¶¶ 3-5; Middleton Decl. 2 ¶¶ 17, 19, 29.) Although the court must draw reasonable factual inferences in Middleton's favor, the court cannot plead allegations for him.

The Second Circuit's recent decision in *Barrows v. Brinker Restaurant Corp.* is instructive. 36 F.4th 45, 51 (2d Cir. 2022). In that case, the panel refused to compel arbitration where the plaintiff's affidavit alone sufficed to create a genuine issue of material fact because the affidavit "adamantly, and categorically, denied [that the plaintiff had] electronically signed any arbitration agreement," thereby constituting "some evidence . . . to substantiate [the] denial that an agreement had been made." *Id.* at 49-50 (quoting *Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir. 1972)). The court reversed the district court because it had "completely discounted the evidentiary value . . . of [the] sworn declaration." *Id.* at 50.

Nonetheless, the Circuit cautioned that its holding did not mean a party's declaration would always defeat a motion to compel arbitration. It identified three situations where granting a motion to compel arbitration would be appropriate: (1) where "the facts alleged in a nonmovant's declaration are so contradictory that doubt is cast upon their plausibility," absent other evidence; (2) where the assertions merely "are based on speculation or are conclusory," and (3) where an affidavit "is blatantly contradicted by the record, so that no reasonable jury could believe it." *Id.* at 51 (citing cases). The affidavit in *Barrows* "had none of these flaws" because "[i]n specific and exacting terms . . . [the plaintiff] categorically denied ever completing" employment paperwork, using her employer's computers, receiving documents with the arbitration policies, using an electronic system alleged by the employer to have been deployed as a standard practice during onboarding, or even owning a personal computer at home that might have been used to complete the alleged agreement. *Id.*

There are no such categorical denials in this case. Middleton denies that he was "made aware" of mandatory arbitration or the opportunity to opt out – not that he was unaware of the terms' existence themselves. (Middleton Decl. 2 ¶ 3-5.) His most categorical declaration is that the format of the terms "*if any were provided*, was on a 3 [inch] by 6 [inch] customer display." (*Id.* ¶ 13 (emphasis added).) But then he goes on, seemingly acknowledging receiving terms, but stating that T-Mobile's in-store display "did not permit a full and complete review and inspection of a document . . . nor allow[] access to the Internet to a document." (*Id.* at ¶ 17.) The configuration had "a low resolution, low light display for customer use that [was] fixed to the countertop and [had] no internet access." (*Id.* at ¶ 15.) He then alleges that his signature was affixed to documents he did not see in full, but not that he never signed the documents themselves (except for the one dated October 17, 2014). (*Id.* at ¶¶ 18, 23.) And even for the receipt he does deny having signed, he still alleges only that

the "alleged receipt . . . did not include a *full copy* of the then effective Terms & Conditions." (*Id.* at ¶ 24 (emphasis added).)

Even viewed in the light most favorable to Middleton, his affidavits – the only evidence he has produced – fall well short of the allegations in *Barrows*. Without even assessing whether the allegations contradict the rest of the documentary record, or are so implausible as to be unbelievable by a jury, they are simply not categorical denials that Middleton was unaware that there were contractual terms and conditions included on those receipts.

For its part, T-Mobile claims that at all relevant times prior to 2019,

> T-Mobile stores assist[ed] customers through desktop computers and tablets, known as REMOs. . . . [T]he customer would be handed the REMO or presented with the entire agreement digitally on a computer screen. The customer had the opportunity to review and scroll through the agreement being shown to him with, e.g., a stylus or finger. All of the contract terms shown on the agreements attached to my prior declaration and this declaration were presented on the screen. The customer was then asked to electronically sign the agreement with, e.g., a stylus or finger, using either the REMO or a connected Ingenico device used to accept electronic signatures. The customer could request a printed copy of any agreements and receipts. T-Mobile does not have a record of whether an agreement was printed unless the agreement states that it was. The T&Cs were not displayed on these devices directly but instead referenced in the agreements presented on the devices.

(Muzio Decl. 2 ¶¶ 10-11.) Middleton does not specifically deny this arrangement, but says instead that the store used only a pen pad display. (*See* Middleton Decl. 2 ¶ 29; Decl. of Reginald Middleton, Ex. B (Dkt. 30-2).)

11

But even if there was some doubt about the "conspicuous" format of the existence of terms during the period when a limited-functionality REMO or Ingenico device may or may not have been used, there is at least one agreement in which the kind of 3x6-inch pen pad was apparently *not* the method of display: On April 3, 2017, Middleton signed (and he does not deny he signed) an equipment installment plan contract for his account which was completed on a DocuSign platform. (*See* Muzio Decl. 2 ¶ 12; Mot. to Compel, Ex. M (Dkt. 20-15) at 1, 5.) On that platform,

> the customer would have to access the link to the agreement provided by T-Mobile using Docusign's platform. On that platform, the entirety of the agreement would be presented to the customer for review on any device the customer chose to use to review the agreement. The customer would then have the option to provide his or her electronically signature on the agreement using the Docusign platform. Once the customer places the signatures and completes the document signing process, T-Mobile is provided a copy of the complete agreement. On information and belief, the full and executed document is available for download by the customer from Docusign's platform. The T&Cs were not displayed on DocuSign directly but instead referenced in the agreements presented on the platform.

(Muzio Decl. 2 at ¶ 12.) Middleton does not deny his use of this platform, or the authenticity of the receipt marked with the DocuSign insignia.

In contrast with *Barrows*, Middleton makes no effort to dispute the authenticity of the DocuSign receipts. Thus, "absent other evidence," 36 F.4th at 51, the court credits the authenticity of those receipts and finds that Middleton received the terms in a way that was both "temporally and spatially" coupled with his purchase of T-Mobile devices and services. *Schnabel v. Trilegiant Corp.*, 697

F.3d 110, 127 (2d Cir. 2012). Though cell phone services are regularly accompanied by contractual terms at any time, here they were delivered at the point of purchase when buying a device. That reasonably puts customers on notice, because

> inasmuch as consumers are regularly and frequently confronted with non-negotiable contract terms, particularly when entering into transactions using the Internet, the presentation of these terms at a place and time that the consumer will associate with the initial purchase or enrollment, or the use of, the goods or services from which the recipient benefits at least indicates to the consumer that he or she is taking such goods or employing such services subject to additional terms and conditions that may one day affect him or her.

*Id.*

From all of this, the court concludes that Middleton has failed to provide "some evidence" to substantiate his claim: the allegations themselves do not do so, and even if they did, they would be belied by the evidence in the record.

### 2. Assent

As to the closely related question of whether Middleton assented to contract, the material facts are not genuinely in dispute there, either. Though the parties disagree about precisely when Middleton's relationship with T-Mobile began – whether at the time Middleton was added to a third-party's account and his service activated, at the time Middleton officially became a responsible party for billing, at the time Middleton became the sole such party, or at the first time Middleton purchased a device but without his denying that the signature on the receipt was his[5] – it had

---

[5] T-Mobile produced a receipt for the purchase of a Galaxy Note device dated October 17, 2014, which Middleton appears to have signed – the

in any case certainly begun by the time Middleton alleges his injuries began in July 2017. (*See* Compl. ¶ 6; Middleton Decl. 2 ¶ 7.) No reasonable jury could find otherwise.

By July 2017, Middleton had repeatedly signed agreements with T-Mobile which he does not dispute:

- On April 18, 2015, Middleton appears to have signed (and he does not deny having signed) a receipt for a device associated with the -5953 phone number later the subject of the alleged hacking. (Muzio Decl. 2, Ex. T (Dkt. 31-1) at ECF pp. 40-41.)

- On April 24, 2015, Middleton appears to have signed (and he does not deny having signed) a receipt for a device associated with the -5953 phone number later the subject of the alleged hacking. (Mot. to Compel, Ex. A at ECF p. 3.) This document also identifies the credit card used to make the purchase as Middleton's. (*Id.*)

- On May 30, 2015, Middleton appears to have signed (and he does not deny having signed) a receipt for a device associated with the -5953 phone number later the subject of the alleged hacking. (Muzio Decl. 2, Ex. U (Dkt. 31-1) at ECF pp. 43-45.)

- On March 11, 2016, Middleton appears to have signed (and he does not deny having signed) a receipt for a device associated with his same billing account, but for a different phone line (ending in -8512). (Mot. to Compel, Ex. F at ECF pp. 2, 4.)

---

same date Middleton identifies as when his line was first activated. (Muzio Decl. 2 at 7, 9; Middleton Decl. ¶ 2; Mem. in Support Ex. C (Dkt. 30-3).) But Middleton denies signing it, even though the signature plainly appears to match those on many other documents in the record. (Middleton Decl. 2 at ¶ 23.)

- On August 19, 2016, Middleton appears to have signed (and he does not deny having signed) a receipt for a device associated with his same billing account, but for an unidentified phone line. (Mot. to Compel, Ex. H at 7.) The receipt is expressly identified as a "contract and disclosures." (*Id.* at 3.)

- On September 5, 2016, Middleton appears to have signed (and he does not deny having signed) a receipt for services associated with his same billing account, but for a different phone line (ending in -5339). (Mot. to Compel, Ex. I (Dkt. 20-11) at 1.)

- On October 28, 2016, Middleton appears to have signed (and he does not deny having signed) a receipt for a device associated with his same billing account, but for an unidentified phone line. (Mot. to Compel, Ex. J at 5.) The receipt is expressly identified as a "contract and disclosures." (*Id.* at 1.)

- On November 18, 2016, Middleton appears to have signed (and he does not deny having signed) a receipt for a device associated with his same billing account, but for an unidentified phone line. (Mot. to Compel, Ex. K at 5.) The receipt is expressly identified as a "contract and disclosures." (*Id.* at 1.)

- On November 25, 2016, Middleton appears to have signed (and he does not deny having signed) a receipt while returning device associated with his same billing account, but for a device without a number. (Mot. to Compel, Ex. L at 1.)

- On April 3, 2017, Middleton appears to have signed (and he does not deny having signed) a receipt for a device associated with his same billing account, but for an unidentified phone line. (Mot. to Compel, Ex. M at 5.) The

receipt is expressly identified as a "contract and disclosures." (*Id.* at 1.)

- On May 3, 2017, Middleton appears to have signed (and he does not deny having signed) two receipts for a device and service associated with his same billing account, but for an unidentified and a different phone line (ending in -4219). (Mot. to Compel, Ex. N at 5; Mot. to Compel, Ex. O at 1.) One of these receipts was for an "equipment installment plan" expressly identified as a "contract and disclosures." (Mot. to Compel, Ex. N at 1.)

On each of these receipts, Middleton's signature appears to be the same as the others.[6] And rather than denying that he signed (all but one of) the agreements, he claims instead that the documents are irrelevant. That is because, he says, the purchases involved phone lines – on the same account – that were different than the one he alleges was hacked or because the documents listed the account owner as the third-party previously responsible for billing. (Middleton Decl. 2 ¶ 28.) But the terms in effect at the first time that Middleton signed a T-Mobile receipt (or at least the first time that he does not deny signing a receipt) – on April 24, 2015 (*see* Mot. to Compel, Ex. A at ECF p. 2) – apply to the entire account, even if individual lines may have additional or different terms. (*See* Mot. to Compel, Ex. B at 2 ("Your Agreement applies to each line of Service, although different T&Cs may apply to different lines of Service on your account.").) And notwithstanding the fact that two of the receipts list a third-party's name on them, both clearly show Middleton's signature, one displaying his name as associated with the credit card making the

---

[6] But not precisely the same, suggesting that it was not affixed electronically automatically by T-Mobile. *Cf. Barrows*, 36 F.4th at 52-53 (considering the possibility that agents of an employer signed a disputed agreement on the plaintiff's behalf).

16

purchase. (*See* Mot. to Compel, Ex. A at ECF p. 3; Mem. in Support, Ex. C (Dkt. 30) at ECF p. 3.) Middleton denies having signed the October 17, 2014, receipt, but later, other receipts bearing Middleton's signature also list him as the account owner, consistent with the date T-Mobile claims the Billing Account Name was changed to his. (*See* Muzio Decl. 1 ¶ 4 (attesting that the Billing Account Name was changed on March 11, 2016); Mot. to Compel, Ex. F (March 11, 2016 Receipt) at ECF pp. 2, 4; Ex. H (August 19, 2016 Receipt) at ECF pp. 4, 8; Ex. I (September 5, 2016 Receipt) at ECF p. 2; Ex. J (October 28, 2016 Receipt) at ECF pp. 3, 7; Ex. K (November 18, 2016 Receipt) at ECF pp. 3, 7; Ex. L (November 25, 2016 Receipt) at ECF p. 2; Ex. M (April 3, 2017 Receipt) at ECF pp. 5, 9; Ex. N (May 3, 2017 Receipt) at ECF pp. 4, 8; Ex. O (May 3, 2017 Receipt) at ECF p. 2.)[7]

Given this record, and the fact that Middleton's affidavit does not deny signing any of these receipts (except one), the court concludes that he manifested his assent to T-Mobile's terms.

Because Middleton was on notice of T-Mobile's terms and assented to them, T-Mobile's motion to compel arbitration is GRANTED.

## III.  APPLICABILITY TO VERITASEUM

The parties next dispute whether, if Middleton must arbitrate his claims, the court must send his company, Veritaseum, LLC, to arbitration as well. The court concludes that it must.

Middleton is the "sole owner" of Veritaseum and "maintained [his account at T-Mobile] for the use of Veritaseum and himself."

---

[7] Although T-Mobile produced other, still later receipts from 2018 and 2021, (Mot. to Compel, Ex. Q; Muzio Decl. 2, Exs. V, W, X, and Y), the court considers only those that may establish a contractual relationship between T-Mobile and Middleton before his alleged injuries began.

(Compl. ¶ 6.) Middleton "accessed his Veritaseum accounts, wallets, and exchanges through his T-Mobile account" and Veritaseum "paid for the T-Mobile account." (*Id.* ¶ 29.) Although Middleton acknowledges that he "used his T-Mobile account for the business of Veritaseum," he notes that his LLC does not separately appear on the receipts or other documents in the record. (*Id.* ¶ 20.)

That fact alone, however, cannot permit Middleton's LLC – a single-member LLC otherwise indistinguishable from him, apart from its limitation on liability – to evade arbitration where Middleton cannot. Because the court concludes that Veritaseum received a "direct benefit" from the contract between Middleton and T-Mobile, it must also arbitrate its claims. *See Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) ("A party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause."); *see also Belzberg v. Verus Invs. Holdings Inc.*, 21 N.Y.3d 626, 634 (2013) (analyzing a direct benefit under New York law where a non-signatory did not derive "profits . . . based . . . [on an] agreement involving" the signatories). Here, Veritaseum, because it consisted only of Middleton, by definition knew of the T-Mobile agreement; it raised no objections to the contract; and it benefitted from the agreement by making use of T-Mobile's services to conduct its business. *See MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001). Because a "direct benefit" plainly existed, the court need not analyze the (likely) possibility of an agency relationship between Middleton and Veritaseum that would also justify compelling the LLC into arbitration. The result is the same: Veritaseum must also arbitrate its claims.

## IV.  MIDDLETON'S OTHER ARGUMENTS

Having found that a valid arbitration agreement existed, Middleton's and Veritaseum's other claims must also be sent to

18

arbitration because they "touch matters" that fall within the scope of the agreement. *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987). Indeed even if there was some ambiguity to that end, it too would have to be "resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 25.

## V. MOTION TO STAY PROCEEDINGS

When "all of the claims in an action have been referred to arbitration and a stay requested," a district court shall stay proceedings rather than dismiss the action. *Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015). Accordingly, T-Mobile's motion to stay this action is GRANTED.

## VI. CONCLUSION

For the foregoing reasons, Defendant's motion to compel arbitration is GRANTED. During the pendency of arbitration, proceedings are STAYED in this court.

SO ORDERED.

Dated: Brooklyn, New York
August 24, 2022

s/NGG

NICHOLAS G. GARAUFIS
United States District Judge